## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| LONZA WALKERSVILLE, INC. | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No._____ |
| | ) | |
| v. | ) | |
| | ) | |
| CELLULAR DYNAMICS | ) | **JURY TRIAL DEMANDED** |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

1.     Plaintiff, Lonza Walkersville, Inc. ("Lonza"), by and through its undersigned counsel, brings this action seeking a declaratory judgment that U.S. Patent Nos. 8,546,140 ("the '140 Patent"), 8,268,620 ("the '620 Patent"), 8,741,648 ("the '648 Patent"), 8,691,574 ("the '574 Patent"), 9,447,382 ("the '382 Patent"), 8,765,470 ("the '470 Patent"), and 8,183,038 ("the '038 Patent"), (collectively the "CDI Patents" and attached hereto as Exhs. A-G) are invalid and/or unenforceable.

## PARTIES

2.     Plaintiff Lonza is a corporation organized and existing under the laws of Delaware, with its principal place of business at 8830 Biggs Ford Road in Walkersville, Maryland.    Lonza is one of the world's leading and most-trusted suppliers to the pharmaceutical, biotech and specialty ingredients markets.

3.     Upon information and belief, Defendant Cellular Dynamics International, Inc. ("CDI") is a company organized and existing under the laws of Wisconsin, with its principal place of business at 525 Science Drive, Madison, Wisconsin 53711, and regularly conducts

business in this judicial district.

4.      The '140 Patent issued on October 1, 2013, and is entitled METHODS FOR THE PRODUCTION OF IPS CELLS USING NON-VIRAL APPROACH.  It is listed as assigned to CDI.  *See* Ex. A.

5.      The '620 Patent issued on September 18, 2012, and is entitled OCT4 AND SOX2 WITH SV40 T ANTIGEN PRODUCE PLURIPOTENT STEM CELLS FROM PRIMATE SOMATIC CELLS.  It is listed as assigned to Wisconsin Alumni Research Foundation.  Upon information and belief, CDI is the exclusive licensee of this patent.  *See* Ex. B.

6.      The '648 Patent issued on June 3, 2014, and is entitled REPROGRAMMING T CELLS AND HEMATOPOIETIC CELLS.  It is listed as assigned to CDI.  *See* Ex. C.

7.      The '574 Patent issued on April 8, 2014, and is entitled GENERATION OF INDUCED PLURIPOTENT STEM CELLS FROM SMALL VOLUMES OF PERIPHERAL BLOOD.  It is listed as assigned to CDI.  *See* Ex. D.

8.      The '382 Patent issued on September 20, 2016, is a continuation of the '574 Patent described above, and is entitled GENERATION OF INDUCED PLURIPOTENT STEM CELLS FROM SMALL VOLUMES OF PERIPHERAL BLOOD.  It is listed as assigned to CDI.  *See* Ex. E.

9.      The '470 Patent issued on July 1, 2014, and is entitled REPROGRAMMING IMMORTALIZED B-CELLS TO INDUCED PLURIPOTENT STEM CELLS.  It is listed as assigned to CDI.  *See* Ex. F.

10.     The '038 Patent issued on May 22, 2012, and is entitled COMPOSITION COMPRISING RECOMBINANT NUCLEIC ACID ENCODING SOX2, OCT-4, NANOG AND LIN28.  It is listed as assigned to Wisconsin Alumni Research Foundation.  Upon

information and belief, CDI is the exclusive licensee of this patent. *See* Ex. G.

## NATURE OF THE CASE

11.     Lonza brings this action to seek a declaratory judgment that (i) the CDI Patents are invalid under 35 U.S.C. § 101 *et seq.*, and (ii) the '140, '620, '648, '574, and '382 Patents are unenforceable due to inequitable conduct committed during prosecution before the U.S. Patent and Trademark Office.

## JURISDICTION AND VENUE

12.     This is an action for a declaration that each claim of the CDI Patents are invalid pursuant to the patent laws of the United States, 35 U.S.C. § 101 *et seq.*, and that the '140, '620, '648, '574, and '382 Patents are unenforceable due to the inequitable conduct of at least two individuals employed by CDI and who each violated a duty of candor under 37 C.F.R. § 1.56 to the U.S. Patent and Trademark Office in efforts to obtain patent issuance over prior art, to purport to swear behind prior art and to seek multiple patents for inventions not patentably distinct. CDI has specifically threatened Lonza with the CDI Patents. There is an actual controversy between Lonza and CDI.

13.     This Court has original and subject matter jurisdiction over all counts asserted herein. This is an action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and 28 U.S.C. § 1338, and the Patent Laws of the United States 35 U.S.C. § 101 *et seq.*, based upon an actual controversy between the parties to declare that Defendant's patents are invalid and/or unenforceable.

14.     This Court has personal jurisdiction over Defendant because, upon information and belief, Defendant has entered into business relationships with entities located in this District, such as Astra Zeneca, including licensing the CDI Patents at issue here, thereby

3

establishing continuous and systematic contacts with this forum. *See, e.g.*, Cellular Dynamics International, News & Events, Cellular Dynamics Announces Agreement with AstraZeneca on Use of iPSC-derived Human Cells in Drug Discovery Research (Jan. 3, 2013), *available at* https://cellulardynamics.com/news-events/news-item/cellular-dynamics-announces-agreement-with-astrazeneca-on-use-of-ipsc-derived-human-cells-in-drug-discovery-research/; *see also* AstraZeneca, AstraZeneca in the U.S., *available at* https://www.astrazeneca-us.com/az-in-us.html ("The headquarters of our North America Commercial Business is located in Wilmington, DE and is home to several business functions integral to the U.S. business.").

15.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391, because, among other things, the majority of activities that have occurred that give rise to these causes of action, such as CDI's assertion of the CDI Patents against Lonza—a Delaware corporation—has been conducted in this judicial district.

## FACTS

## I.     Background of the Technology

16.     The technology underlying this controversy relates to stem cells that can be created from somatic cells (*i.e.*, any cells other than reproductive cells) in living adults, rather than harvested from embryos.  These stem cells are called induced pluripotent stem cells ("iPSCs").  iPSCs can be created by taking somatic cells and introducing four specific reprogramming factors into those cells.  This causes these somatic adult cells, such as adult skin cells, to revert back to stem cells.

17.     iPSCs represent a major medical breakthrough in the fields of individualized and regenerative medicine because they provide a single source of an individual patient's cells that can grow indefinitely and give rise to any type of human body cell, including for example liver

or brain cells.  Such cells can be used to repair or outright replace damaged organs and tissues, without the risk of immune rejection, due to the individualized nature of the cells.  In addition, iPSCs provide far-reaching advantages over embryonic stem cells because stem cells derived from embryos have failed thus far to create individually-tailored stem cell lines and have been controversial to harvest.  iPSCs avoid this controversy.

### A.     Dr. Yamanaka was Awarded the Nobel Prize for Discovering iPSCs

18.     iPSC technology was pioneered by Dr. Shinya Yamanaka at Kyoto University in Japan in 2006.  For this discovery, Dr. Yamanaka built upon Sir John Gurdon's previously-developed technology related to cloning, and was awarded the 2012 Nobel Prize along with Sir Gurdon "for the discovery that mature cells can be reprogrammed to become pluripotent."  *See* Press Release, Nobelprize.org, The Nobel Prize in Physiology or Medicine 2012 Jointly to John B. Gurdon and Shinya Yamanaka for the Discovery that Mature Cells Can Be Reprogrammed to Become Pluripotent (Oct. 8, 2012), *available at* https://www.nobelprize.org/nobel_prizes/medicine/laureates/2012/press.html.  iPSCs are already being used in individualized drug discovery efforts and research designed to understand the patient-specific bases of disease.

19.     On December 6, 2006, Dr. Yamanaka filed a patent application based on this ground-breaking work ("Yamanaka I").  He was granted patent protection on this and subsequent inventions.

## II.    Lonza Walkersville Licensed the Yamanaka Technology

20.     Lonza Walkersville, Inc. began as Microbiological Associates in 1947, starting as a one-product company that had substantially grown by the 1950s, when it worked with a company to perform testing of field trials for the Salk polio vaccine.  By the 1960s, it had

various contracts with the National Cancer Institute and the National Institutes of Health. Ultimately, it was bought by Lonza America, Inc., and underwent a name change to Lonza Walkersville.

21.     Lonza is currently engaged in the manufacture of over 1,500 products for pharmaceutical and biotechnology applications such as disease diagnosis, biomedical research, production of diagnostics and therapeutics, and quality control testing of pharmaceuticals and medical devices for the presence of bacterial contaminants.   Over time, it has earned a reputation for quality and safety in the manufacture of chemicals and biotechnology products, both to its customers and regulatory agencies, such as the U.S. Food and Drug Administration ("FDA").   Lonza is now known as one of the largest pharmaceutical manufacturers in the United States, producing pharmaceuticals for large, multi-national companies.  Building on this reputation, Lonza has become a leader in the biotechnology field producing biological medicines, such as insulin for treatment of diabetes, as well as gene and cell therapies.  Lonza has been and continues to be a pioneer in biotechnology, setting standards for a worldwide market.

22.     To maintain and grow its position in the industry, Lonza owns a robust portfolio of its own patented technology, in addition to various license agreements with sophisticated third-parties for external intellectual property that helps to round-out Lonza's cutting-edge work.  Thus, in 2012 and to boost its portfolio of iPSC-related technology, Lonza Walkersville entered into a license agreement with IPS Academia Japan ("IPSAJ"), the licensing company affiliated with Kyoto University, to license Dr. Yamanaka's patent applications, which cover his ground-breaking iPSC work.

### III.    CDI's Invalid and Fraudulently-Procured Patents

23.      Based on the pioneering work of Dr. Yamanaka, researchers at the University of Wisconsin began working with iPSCs.  Upon information and belief, the University of Wisconsin filed patent applications on this work and, ultimately, licensed them to CDI.  Upon information and belief, CDI continued working on iPSCs and filed additional patent applications.

24.      Dr. Amanda Mack is an inventor on the '140, '648, '574, and '382 Patents.  As such, she owed a duty of candor to the U.S. Patent and Trademark Office ("USPTO") during the prosecution of those patents, under 37 C.F.R. § 1.56.  Mr. Nicholas Seay, Chief Technology Officer for CDI, was also involved in the prosecution of the same patents and is a registered patent attorney, and therefore owed that same duty of candor under 37 C.F.R. § 1.56.  Both Dr. Mack and Mr. Seay made materially misleading statements with intent to deceive the USPTO to allow claims during the prosecution of the '140, '620, '648, '574, and '382 Patents.

25.      In particular, and set forth in greater detail below, Dr. Mack and Mr. Seay made statements during the prosecution of these patent applications that all cover the same underlying technology.  Their deceptive and inconsistent statements made during the prosecution of the respective applications went undetected, and opened the road to allowance.  The single most reasonable inference is that they made these misrepresentations to the USPTO with the intent to deceive.

26.      As one example of the material misrepresentations and omissions made, Dr. Mack and Mr. Seay told one examiner that certain technology was straightforward when that statement was needed to secure the allowance of one patent.  Mr. Seay then turned around and made contradictory representations on the same subject matter before a different examiner to

7

secure the allowance of a different patent from a different patent application.  Not only were contradictory statements on the same subject matter made to different examiners, but Dr. Mack and Mr. Seay also materially omitted in each patent application the contradictory submissions made in the other patent application.

27.    These misleading misrepresentations and omissions were made by Dr. Mack and Mr. Seay in connection with CDI's prosecution of the '140 Patent and the '620 Patent.  To procure the '140 Patent, Dr. Mack and Mr. Seay stated that creating the claimed invention would have been "straightforward" once Dr. Mack had conceived of it.  Dr. Mack and Mr. Seay said this because CDI had to prove that Dr. Mack had conceived of and diligently reduced to practice her invention prior to publication of a specific prior art reference in an effort to swear behind that reference.  However, when another CDI Patent was under attack in reexamination, specifically the '620 Patent, Mr. Seay presented the same technology as "unpredictable"—*i.e.*, not "straightforward."  Thus, the same person—Mr. Seay— made contradictory statements about the same technology, to two different patent examiners at the USPTO, to procure two different, unrelated patents.  As set forth in greater detail below, these contradictory statements are irreconcilable, and the single most reasonable inference is that they were made with intent to deceive the USPTO.

28.    Another example of the material misrepresentations and omissions made by Dr. Mack include, once again, additional material misrepresentations and omissions made before different examiners in different patent applications.  The applications at issue in this additional misconduct resulted in the issuance of the '648 and '574 Patents.

29.    In connection with the '648 and '574 Patents, Dr. Mack, Mr. Seay, CDI and its prosecuting attorneys filed or caused to be filed two separate patent applications on the same

subject matter that resulted in the issuance of these patents as separate patents from different patent families even though they are not patentably distinct from each other.  Once more, material misrepresentations and omissions were made before different patent examiners. During the prosecution of the '648 Patent, the patent examiner rejected the claims of the '648 Patent because it did not enable a person of ordinary skill in the art to make the claimed invention.  To obtain patentability of the '648 Patent, Dr. Mack submitted a declaration in that application stating that the alleged work done in connection with the separate CDI patent application that later became the '574 Patent could be used to show that a person of ordinary skill in the art could make the invention claimed in the '648 Patent.  Indeed, the '574 Patent is nothing more than a working embodiment of Example 11 of the '648 Patent, but Dr. Mack, Mr. Seay and CDI and its prosecuting attorneys maintained prosecution on both applications resulting in these two patents.  Furthermore, no disclosure was made in the separate application from which the '574 Patent issued that the alleged invention sought from that examiner was used as an enabling example of the '648 Patent that was being sought from a second examiner. The single most reasonable inference is that Dr. Mack made these misrepresentations to the USPTO with the intent to deceive.

30.     In sum, the inventors and prosecution attorneys are trying to have it both ways. The technology of the '140 Patent application is described as "straightforward" to corroborate a purported date of conception to overcome prior art, but then that same technology is described as "unpredictable" in the '620 Patent application to overcome rejections of obviousness.  The '648 and '574 Patent applications are presented and applied for on patentably distinct subject matter, but then the '648 Patent relies on the '574 Patent to overcome a written description rejection; in the meanwhile, the key declaration from the '648 Patent is never disclosed in the

application for the '574 Patent.  That same declaration also was never disclosed in the '382 Patent, which is a continuation of the '574 Patent.  The single most reasonable inference is that they made these misrepresentations to the USPTO with the intent to deceive.

**A.   Details of CDI's Fraudulent Statements Made to the USPTO to Procure the '140 Patent**

31.   The '140 Patent relates to methods and compositions for iPSCs, including methods for generating essentially vector-free iPSCs.  *See* Ex. A.

32.   Upon information and belief, CDI procured the allowance of the claims and the patentability of the '140 Patent by false, misleading, and fraudulent conduct.  Upon information and belief, the claims would not have been allowed but for this false, misleading, and fraudulent conduct, including the conduct described in the following paragraphs.

33.   During prosecution, the examiner and patent applicants exchanged numerous correspondence prior to the allowance of the application that ultimately resulted in the '140 Patent.

34.   The sequence of the statements made during the prosecution of the '140 Patent is significant, and demonstrates the misrepresentations made to the USPTO.  Among the key and misleading statements are those from Dr. Amanda Mack, one of the named inventors and a current CDI employee, regarding the conception of the invention and subsequent reduction to practice.  Notably, a key piece of prior art, published on November 20, 2007 (the "Yu Reference"), was cited against the '140 Patent.  The Yu Reference would render the '140 application obvious, and therefore unpatentable, because the '140 Patent claims priority to the provisional patent application filed approximately seven months later on June 4, 2008.

35.   Thus, in order to remove the Yu Reference as prior art, Dr. Mack needed to establish that she had conceived of the invention prior to November 20, 2007, and had worked

diligently to reduce this concept to practice until she filed her patent application in June 2008. To help establish her timeline, Dr. Mack submitted three declarations to the USPTO ("Mack I," "Mack II," and "Mack III," respectively). And, Mr. Nicholas Seay, Chief Technology Officer for CDI, correspondingly submitted to the USPTO three purportedly "corroborating declarations" to the Mack declarations ("Seay I," "Seay II," and "Seay III," respectively). Mack I described Dr. Mack's date of conception of the patented invention to be allegedly "prior to November 20, 2007," without specifying the precise, "prior," date. *See* Mack I at ¶ 3. In Mack I, Dr. Mack alluded to her conversations with Mr. Seay during her employee interview process at CDI's predecessor-in-interest. She stated that she was "hired by CDI's predecessor SCP specifically for the purpose of developing techniques for producing iPS lines using non-integrating vectors . . . ." *See* Mack I at ¶ 3. Mr. Seay submitted his first corroborating declaration regarding the discussions he and Dr. Mack had during her job interview. *See* Seay I at ¶ 4. Mack I also stated that choosing human fibroblasts as the somatic cells upon which to run these experiments would be best because these were the "standard cells." *See* Mack I at ¶ 6. Mack I also contained voluminous attachments that consisted of purchase orders and mostly unverified documents purporting to be laboratory notebook pages. All of these attachments were dated November 29, 2007, or later.

36.     The examiner of the '140 Patent found Mack I and the purportedly corroborating Seay I declarations unpersuasive. In his rejection, the examiner also noted that the other inventor, Dr. James Thomson, did not submit a declaration—the absence of which was procedurally improper. *See* Non-Final Rejection dated October 23, 2012 at p. 3; *see also* Manual of Patent Examining Procedure ("MPEP") §715.04(I)(B).

37.     In response to the examiner's rejection, CDI amended the patent's claims and

CDI representatives engaged in an interview with the USPTO, the contents of which were summarized by those CDI representatives, and placed in the prosecution history file. *See* Amendment dated December 21, 2012 and Supplemental Amendment dated February 8, 2013. CDI represented that Dr. Mack was the "sole inventor of the technique for producing iPS lines as described in the earliest priority document and that James Thomson was a joint inventor with Dr. Mack in the application of the these [sic] techniques to broader application, such as transdifferentiation." *See* Amendment dated December 21, 2012, at Remarks. CDI therefore requested that James Thomson be removed as an inventor from the patent application. *See id.*, at Remarks. However, this was never processed by the USPTO, and James Thomson remains an inventor on this patent to this day. He also never submitted a declaration in support of patentability.

38.     On December 21, 2012, Dr. Mack submitted her second declaration, Mack II, to provide further detail on the timeline between the date on which she allegedly conceived of the invention and her efforts to reduce it to practice through June 4, 2008. Her first statement is that she is the ***sole*** inventor on the pending patent application (even though James Thomson was never removed). *See* Mack II at ¶ 1. Importantly, Mack II is where Dr. Mack provided more detail about her conversations with Mr. Seay while applying for her job. Dr. Mack relayed a conversation the two of them had in November 2007—no precise date was specified—where she informed Mr. Seay that "one straightforward and important project" upon joining CDI would be using the vectors from the lab where she did her graduate work "to produce iPS lines that were essentially free of vector components." *See* Mack II at ¶ 5. She also stated in her declaration that she told Mr. Seay that she "had little doubt that [she] would be successful in constructing the vector and transfecting human fibroblasts." *See* Mack II at ¶ 5. Mr. Seay

submitted a declaration purportedly corroborating Dr. Mack's summary of the conversation. *See* Ex. Seay II at ¶ 4.

39.     Dr. Mack also stated that she sent an e-mail to her graduate thesis advisor to obtain vectors for her work: "In days and weeks just after November 20th, I began ordering materials for the project, including contacting my former advisor, Bill Sugden, whom I knew to have the various non-integrating OriP vectors that I had decided to employ in the development of the invention." *See* Mack I at ¶ 4.  However, she did not provide the precise date of that e-mail.  While she was able to provide the precise date of her thesis advisor's response—November, 29, 2007—she never attached any of these e-mails to any of her declarations in support of her purported inventions.

40.     The examiner was still unpersuaded that there was sufficient evidence of diligence, which is required by the MPEP.  *See e.g.*, MPEP §715.07(a); *see also* and Final Rejection dated May 2, 2013 at p. 5.

41.     Dr. Mack submitted another declaration, Mack III.  There she stated that she was diligent beginning on November 19, 2007, the day before the critical date of the cited prior art Yu Reference.  *See* Mack III at ¶ 7.  However, she submitted no contemporaneous evidence to support her claim, such as an offer letter, or signed and dated paperwork from that day, etc., despite stating that she "initiated a number of undertakings to get the foregoing project going." *See* Mack III at ¶ 7.  Mr. Seay, while he did submit a third declaration in support of Mack III, corroborated neither Dr. Mack's purported start date of November 19, 2007, nor her activities for the critical time period.  *See* Ex. Seay III.

42.     Dr. Mack and Mr. Seay submitted no less than three declarations each in an attempt to show that Dr. Mack's efforts leading to the '140 Patent predated the Yu Reference.

However, no cotemporaneous corroborating evidence was submitted for that critical time frame. In fact, the majority of exhibits to Mack I are uncorroborated pages from lab notebooks and unsigned purchase orders, which is legally insufficient evidence of date of conception and reduction to practice.

43.     Directly above the signature blocks on Dr. Mack's and Mr. Seay's declarations is a clause that states s/he declares "that all statements made on information and belief are believed to be true, and further that these statements were made with knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the referenced patent application or any patent issued thereon." *See* Mack I at ¶ 11; Seay I at ¶ 5.

44.     Upon information and belief, the statements contained in Dr. Mack's and Mr. Seay's declarations directed to the purported conception of invention, the diligence of its reduction to practice, and the timeline for both, are false and misleading and notably omit purportedly corroborating internal documents available to CDI.  Upon information and belief, Dr. Mack and Mr. Seay signed multiple declarations and submitted them to the USPTO with knowledge that they had no evidence to corroborate their assertions, or they withheld evidence available to them that would contradict their claims of an alleged earlier conception and reduction to practice, and did so with intent to deceive the USPTO.

45.     Upon information and belief, CDI, acting by and through its counsel, knew the Mack and Seay declarations were false and/or misleading and nonetheless submitted these declarations containing false material information to the USPTO with the intention of deceiving the USPTO to obtain allowance of the claims and issuance of the '140 Patent.   Upon

information and belief, the USPTO relied upon the false and misleading statements and declarations submitted by CDI to the USPTO.

### B. Details of CDI's Fraudulent Statements Made to the USPTO to Procure the '620 Patent

46.     The '620 Patent relates to "methods for reprogramming primate somatic cells to pluripotency using an episomal vector that does not encode an infectious virus" and iPSCs produced using those methods.  *See* Ex. B.

47.     Upon information and belief, CDI procured the allowance of claims from reexamination of the '620 Patent and procured the patentability of the '620 Patent by false, misleading, and fraudulent conduct.  Upon information and belief, the claims would not have been allowed but for this false, misleading, and fraudulent conduct, including the conduct in the following paragraphs.

48.     On April 25, 2014, Lonza filed a petition for *Ex Parte* Reexamination Request for the '620 Patent.  Lonza alleged that the patent was improperly granted because it was anticipated and/or obvious over prior art.  The USPTO granted reexamination because it found a substantial new question of patentability over the prior art.  Reexamination was instituted on all claims.  This reopened patent prosecution with the USPTO.

49.     As part of the reexamination proceedings, on January 5, 2015, Mr. Seay and the Attorney for the Patent Owner had an interview with the patent examiners handling the reexamination of the '620 Patent.  During that interview, Mr. Seay made false statements to the examiners about the state of the prior art in October 2008 when the patent application that ultimately led to the '620 Patent was filed.  These false statements are memorialized in the Patent Owner's Statement of the Interview submitted by CDI to the USPTO.  The Patent Owner's Statement of the Interview describes Mr. Seay and the Attorney for the Patent Owner

as saying that:

> unpredictability would have prevented an ordinarily skilled artisan
> from establishing a reasonable expectation of success by merely
> combining the documents cited in each rejection for obviousness.
> The discussion focused on evidence in the citations and in other
> available documents that established that the conditions for non-
> viral reprogramming of human cells were different from those of
> mouse cells, and that as of the Patent Owner's priority date, non-
> viral reprogramming of human somatic cells had yielded no human
> pluripotent cells that were substantially vector-free.

*See* Response to Non-Final Office Action dated February 9, 2015 at pp. 5-6.  Upon information

and belief, however, this statement was false.

50.     The above statements made by Mr. Seay directly contradict a declaration that Mr.

Seay submitted during the prosecution of the '140 Patent, discussed above.   In the Seay II

Declaration, Mr. Seay stated that he was "providing this declaration to corroborate the

statements" of Dr. Mack related to a conversation the two of them had in November 2007,

almost a year before the patent application that lead to the '620 Patent was filed. *See* Seay I and

II at ¶ 4.   In her declaration (Mack II), Dr. Mack states that she informed Mr. Seay that "one

straightforward and important project" upon joining CDI would be "using the vectors from the

lab where she did her graduate work "to produce iPS lines that were essentially free of vector

components." *See* Mack II at ¶ 5.   She also stated in her declaration that she told Mr. Seay that

she "had little doubt that [she] would be successful in constructing the vector and transfecting

human fibroblasts with those vectors." *See* Mack III at ¶ 5.   Put simply, in December 2012, Mr.

Seay declared that Dr. Mack told him that reprogramming somatic cells to produce iPS cell

lines that were essentially free of vector components would be "*straightforward*" and that she

expected to "*be successful* in constructing the vector and transfecting human fibroblasts." *See*

Seay II at ¶ 4 (emphasis added).   In January 2015, in an examiner interview during prosecution

of the reexamination of the '620 Patent, Mr. Seay stated that the unpredictability of the field of episomal reprogramming of primate somatic cells at the time the invention was made "would have *prevented an ordinarily skilled artisan from establishing a reasonable expectation of success*" by combining the references cited in the rejection. *See* Response to Non-Final Office Action dated February 9, 2015 at pp. 5-6 (emphasis added). The December 2012 and January 2015 statements directly contradict each other, presenting contrary representations to the USPTO with the objective of procuring multiple patents for the same underlying technology.

51.     Mr. Seay knew that an ordinarily skilled artisan would have a reasonable expectation of success for non-viral reprogramming of human cells and that such reprogramming was not different from that of mouse cells at the time of the Patent Owner's priority date. He said so during the prosecution of the '140 Patent. *See* '140 Patent's Seay II Declaration, discussed *supra*.

52.     Directly above the signature block on Mr. Seay's declaration states "that all statements made on information and belief are believed to be true, and further that these statements were made with knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the referenced patent." *See* Declaration of Nicholas Seay dated February 4, 2015, at ¶ 10.

53.     Upon information and belief, the statements contained in Mr. Seay's declaration are false, and were made with intent to deceive the USPTO.

54.     Upon information and belief, CDI, acting by and through their counsel, knew the Seay declaration was false and/or misleading and nonetheless submitted this declaration containing false material information to the USPTO with the intention of deceiving the USPTO

17

to obtain allowance of the claims from reexamination.  Upon information and belief, the USPTO relied upon the false and misleading statements and declarations submitted by CDI to the USPTO.

        **C.**    **Details of CDI's Fraudulent Statements Made to the USPTO to Procure the '648 Patent**

55.       The '648 Patent relates to methods and compositions relating to the production of iPSCs.  For example, iPSCs may be generated from $CD34^+$ hematopoietic cells, such as human $CD34^+$ blood progenitor cells, or T cells.  Various iPS cell lines are also provided.  *See* Ex. C.

56.       Upon information and belief, CDI procured the allowance of the claims in the '648 Patent and procured the patentability of the '648 Patent, by false, misleading, and fraudulent conduct.  Upon information and belief, the claims would not have been allowed but for this false, misleading, and fraudulent conduct, including the conduct in the following paragraphs:

57.       On October 30, 2013, during the prosecution of the '648 Patent, the examiner issued a Final Rejection because there was no support in the specification for producing iPSCs from $CD34^+$ cells, among other rejections.  *See* Final Rejection dated October 30, 2013 at pp. 3-10.  Dr. Mack, an inventor on the '648 Patent, submitted a declaration in support of patentability on December 20, 2013 ("Mack '648 Declaration").  In that declaration, Dr. Mack attached a copy of the U.S. Patent Publication that would ultimately issue as the '574 Patent, discussed further below.  *See* Mack '648 Declaration, at Ex. 1.  She described her work for the '574 Patent as being a "continuation of the $CD34^+$ studies described in Example 11 of the '648 Patent."  *See* Mack '648 Declaration at ¶ 2.  She went through a detailed analysis of the examples in the '574 Patent publication as though they were working examples from the '648 Patent.  *See* Mack '648

Declaration at ¶¶ 3-4.  However, the '574 Patent is not even in the same patent family[1] as the '648 Patent, and is held out to contain an invention that is novel and patentably distinct from the '648 Patent.  This is improper.

58.     Directly above the signature block on Dr. Mack's declaration, she declares "that all statements made on information and belief are believed to be true, and further that these statements were made with knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the referenced patent application or any patent issued thereon."  *See* Mack '648 Declaration at ¶ 5.

59.     Furthermore, Dr. Mack, the inventor on this Patent, never disclosed the Mack II Declaration from the '140 Patent, discussed above, where she described the field of the invention as "predictable" and "straightforward."  *See* Mack II.

60.     The single most reasonable inference is that Dr. Mack made these misrepresentations to the USPTO with the intent to deceive.

61.     Upon information and belief, CDI, acting by and through their counsel, knew the Mack declaration was false and/or misleading and nonetheless submitted this declaration containing false material information to the USPTO with the intention of deceiving the USPTO to obtain allowance of the claims and issuance of the patent.  Upon information and belief, the USPTO relied upon the false and misleading statements and declarations submitted by CDI to the USPTO.

---

[1] A group of patents issued for the same invention that are linked (directly or indirectly) via the same priority document(s) are considered to belong to the same patent family.

**D.     Details of CDI's Fraudulent Statements Made to the USPTO to Procure the '574 and '382 Patents**

62.     The '574 and '382 Patents relate to methods and compositions relating to the production of iPSCs.  For example, iPSCs may be generated from peripheral blood cells, such as human blood progenitor cells, using episomal reprogramming and feeder-free or xeno-free conditions.  *See* Exhs. D and E.

63.     The '382 Patent is a continuation of the '574 Patent, and is therefore a member of the same family.  Thus, all fraudulent conduct that occurred during the prosecution of the '574 Patent is imputed to the prosecution of all of its family members, including the '382 Patent.

64.     Upon information and belief, CDI procured the allowance of claims of the '574 Patent and procured the patentability of the '574 Patent, by false, misleading, and fraudulent conduct.  Upon information and belief, the claims would not have been allowed but for this false, misleading, and fraudulent conduct, including the conduct in the following paragraphs.

65.     The declaration that Dr. Mack submitted in the '648 Patent, discussed above, also constitutes a misrepresentation and omission in the prosecution of the '574 Patent.  Dr. Mack described her work in the '574 Patent as being a "continuation of the CD34$^+$ studies described in Example 11 of the '648 Patent."  *See* Mack '648 Declaration at ¶ 2.  However, Dr. Mack never disclosed the Mack '648 Declaration to the examiner during the prosecution of the '574 Patent or its child application, the '382 Patent.  The examiner issued a Notice of Allowance for the '574 Patent on January 30, 2014.  This is more than one month after Dr. Mack submitted the Mack '648 Declaration stating that the work in the '574 Patent was a continuation of the work in Example 11 of the '648 Patent.  *See* Notice of Allowance dated January 30, 2014.  At no time during the prosecution of the '574 Patent did Dr. Mack state that the invention described therein represented continuing work from Example 11 of the '648 Patent.

66.     Furthermore, Dr. Mack, never disclosed the Mack II declaration from the '140 Patent, discussed above, where she described the field of the invention as "predictable" and "straightforward." *See* Mack II.

67.     The single most reasonable inference is that Dr. Mack made these misrepresentations to the USPTO with the intent to deceive.

68.     Directly above the signature block on Dr. Mack's declaration is a clause that states that she declares "that all statements made on information and belief are believed to be true, and further that these statements were made with knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the referenced patent application or any patent issued thereon." *See* Mack '648 Declaration at ¶ 5.

69.     Upon information and belief, CDI, acting by and through their counsel, knew the Mack declaration was false and/or misleading and nonetheless submitted this declaration containing false material information to the USPTO with the intention of deceiving the USPTO to obtain allowance of the claims and issuance of the patent.  Upon information and belief, the USPTO relied upon the false and misleading statements and declarations submitted by CDI to the USPTO.

## IV.     Threats by CDI Against Lonza Walkersville

70.     On February 4, 2015, in support of the '620 Patent reexamination discussed above, Mr. Seay signed a declaration purporting to show copying by Lonza.  *See* Declaration of Nicholas Seay dated February 4, 2015, at ¶ 3.

71.     In his declaration, Mr. Seay identified Lonza as "copying the claimed invention"

in the '620 Patent and went so far as to attach as Exhibit A to that declaration a PowerPoint presentation given by Lonza at a 2013 NIH meeting as evidence of the alleged copying.  *See id.*

72.     On or about November 4, 2015, CDI's current Chief Technology Officer, Mr. Takashi Okada, contacted Lonza's Head of Commercial Development for Cell Therapy informing him that CDI had "implemented a licensing program for [its] iPSC patents," and further requested consideration of his letter.  Attached to that, he sent a list of patents to license, which included the patents in this complaint (except the '382 Patent, which issued later).

73.     Then, on or about November 29, 2016, CDI's legal counsel sent a letter on behalf of CDI alleging that some of Lonza's cell reprogramming kits that can be used to make iPSCs infringed the '140, '648, '574, '038, and '620 Patents.  *See* Ex. H.

74.     As a result of CDI's threats against Lonza and as a result of ongoing competition between Lonza and CDI in the iPSC market, Lonza reasonably expects that CDI will continue to interfere with Lonza's lawful business operations by wrongly asserting that Lonza infringed upon CDI's alleged intellectual property rights.

**COUNT I**
**Declaratory Judgment of Invalidity of U.S. Patent Nos. 8,546,140; 8,268,620; 8,741,648;**
**8,691,574; 9,447,382; 8,183,038; and 8,765,470 ("CDI Patents")**

75.     Lonza repeats and re-alleges all previous paragraphs as if fully set forth herein.

76.     The claims of the CDI Patents are invalid because the claimed inventions do not satisfy the conditions for patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 102 and/or 103. For example, the claims of the CDI Patents are invalid under 35 U.S.C. §§ 102 and/or 103, at least in view of U.S. Patent Publication No. 2010/0279404, published on November 4, 2010, to Yamanaka et al., alone or in combination with other prior art; Kaji et al., "Virus-free Induction of Pluripotency and Subsequent Excision of Reprogramming Factors," Nature, 458: 771-775 (2009), alone or in combination with other

prior art; Ren et al., "Establishment and Applications of Epstein-Barr Virus-Based Episomal Vectors in Human Embryonic Stem Cells," Stem Cells, 24: 1338-1347 (2006), alone or in combination with other prior art; and/or Yu et al., "Induced Pluripotent Stem Cell Lines Derived from Human Somatic Cells," Science, 318: 1917-1920 (2007), alone or in combination with other prior art; U.S. Patent No. 4,002,173 to Manning et al., alone or in combination with other prior art. Additionally, certain claims of the CDI Patents are invalid under 35 U.S.C. § 112 for lack of written description and/or enablement.

77.     A present, genuine and justiciable controversy exists between Lonza and CDI regarding, *inter alia*, the validity of the CDI Patents.

78.     Because Lonza denies that the CDI Patents and the claims thereof are valid and enforceable, a declaration of rights between the parties is both appropriate and necessary.

79.     Lonza is entitled to a declaration that the CDI Patents and the claims thereof are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, and/or the doctrine of obviousness-type double patenting.

**COUNT II**
**Declaratory Judgment of Unenforceability of U.S. Patent Nos. 8,546,140; 8,268,620; 8,741,648; 8,691,574; and 9,447,382 for Inequitable Conduct**

80.     Lonza repeats and re-alleges all previous paragraphs as if fully set forth herein.

81.     For the reasons set forth herein, the claims of the '140; '620; '648; '574; and '382 Patents are unenforceable due to inequitable conduct before the USPTO.

82.     A judicial declaration of unenforceability of the '140; '620; '648; '574; and '382 Patents due to inequitable conduct is necessary and appropriate to resolve this controversy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lonza respectfully requests relief from this Court against Defendant as follows:

a.      Judgment that the CDI Patents are invalid;

b.      Judgment that the U.S. Patent Nos. 8,546,140; 8,268,620; 8,741,648; 8,691,574; and 9,447,382 are unenforceable due to inequitable conduct;

c.      Judgment that this is an exceptional case under 35 U.S.C. § 285 and award Lonza its reasonable attorneys' fees; and

d.      Such other and further relief that the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable.


*OF COUNSEL:*

Anne Elise Herold Li
James K. Stronski
Preetha Chakrabarti
CROWELL & MORING LLP
590 Madison Avenue, 20th fl.
New York, NY 10022
212-223-4000
ali@crowell.com
jstronski@crowell.com
pchakrabarti@crowell.com


Dated: December 22, 2016

*/s/ Chad M. Shandler*
Chad M. Shandler (#3796)
Travis S. Hunter (#5350)
RICHARDS, LAYTON & FINGER LLP
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
302-651-7700
shandler@rlf.com
hunter@rlf.com


*Attorneys for Plaintiff, Lonza Walkersville, Inc.*